UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - -- - - - - - - - - X

**UNITED STATES OF AMERICA,**

       Plaintiff,

*ex rel.* **RELATOR LLC**, a California limited
liability company,

       Relator,

    v.

**ANDY NOE,** an individual, **JOHN NOE,** an
individual; **TOM NOE**, an individual; and
**MUELLER SERVICES, INC.**, a New York
Corporation, and DOES 1-10,

       Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - -- - - - - - -X

Case No.

**COMPLAINT FOR VIOLATIONS OF
FEDERAL FALSE CLAIMS ACT**

**FILED *IN CAMERA* UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)**

<u>**DO NOT PLACE ON PACER**</u>

**JURY TRIAL DEMANDED**

Plaintiff RELATOR LLC ("Plaintiff") complains of **ANDY NOE,** an individual, **JOHN NOE,** an individual; **TOM NOE**, an individual; and **MUELLER SERVICES, INC.,** ("MSI") a New York Corporation, and DOES 1-10:

## JURISDICTION & VENUE

1.     This Court has subject matter jurisdiction over the Plaintiff's claims brought under the FCA, 31 U.S.C. §§ 3279, et seq., pursuant to 31 U.S.C. §§ 3730 and 3732. This Court has supplemental jurisdiction to entertain the common law and equitable causes of action under 28 U.S.C. § 1367(a).

2.     Plaintiff The United States of America is also located in the Western District of New York. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because at all times material hereto, Defendants transacted business and are located in the Western District of New York, and acts proscribed by 31 U.S.C. § 3729 occurred in this district.[1]

3.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a), and under 28 U.S.C. §§ 1391(b) and 1395(a), because the Defendant's acts that form the basis of this Complaint occurred in the Western District of New York.

4.     Relator's claims and this Complaint are not based upon prior public disclosures of allegations or transactions in a federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation; or from the news media. To the extent that there has been a public disclosure unknown to Relator, it is the "original source" within the meaning of 31

---

[1] MUELLER operates throughout New York, and has its headquarters in Tonawanda, New York, in the Western District of New York.

U.S.C. § 3730(e)(4)(B) and/or the public disclosure is a result of Relator voluntarily providing this information to the United States Government prior to filing this *qui tam* action.

### INTRODUCTION AND SUMMARY

5.      In this matter the owners of a lucrative information services company knowingly misappropriated millions of dollars from the US Federal government's Paycheck Protection Program ("PPP"). Defendant MSI specializes in preparation of real estate and risk assessment reports for high-value commercial and residential properties. Defendants submitted falsified loan documents to the SBA to obtain the loan, which it certainly and undoubtedly was <u>not</u> qualified for and was <u>not</u> allowed to receive.  MSI falsely reported to the government that its employee numbers were exactly 499, suspiciously only 1 count under the 500 maximum. This was done to avoid disqualification. MSI did not urgently need money to avoid business failure. It was financially successful and had been expanding during the Pandemic, as it demonstrated in 2020 with the launch of a major new initiative, MSI's Mueller at Home application, which allowed their customers a whole new format for engaging with the company. MSI exhibited no signs of economic distress around the time it applied for the loan.  Some of all of these indicants would be seen coming from a company in economic distress. None were present.

6.      Even if MSI had some minor business decline in 2020, which they did not appear to, their own financial reserves should have easily supported their payroll. MSI executives saw an opportunity to take money from the PPP program and took advantage. They lied about their economic need for help. They lied about their revenues. They lied about their employee payroll size. Defendants applied for and received a large $6,703,446 loan, but instead of giving it back the next year, they sought out and obtained loan forgiveness. Neither the loan nor the loan forgiveness

were permissible under the SBA's rules. Rather than returning the ill-gotten money, MSI and its executives kept the money, billing millions to the US taxpayer.

7.      Defendants used their company to misappropriate $6,703,446 from the US government by making false claims to the Small Business Administration ("SBA"). Defendants falsified the number of employees, falsified economic uncertainty so grave it threatened their ability to pay their employees; falsified the loan amount needed to respond to that falsified threat, and falsified needing money from the US government as opposed to their own business partners or coffers.

8.      The Defendants used their construction business, MSI, to apply for and receive a PPP loan for the amount of $6,703,446 purportedly to cover payroll costs. However, MSI and the individual defendant executives who controlled MSI:

    a.      Falsified loan eligibility;

    b.      Falsified its status as a "small business" concern as defined;

    c.      Falsified that is not a dominant business in its field;

    d.      Falsified number of jobs;

    e.      Falsified the use of the loans on authorized expenses; and

    f.      Falsified the economic necessity for the loans.

9.      **Falsified Figure of 499 Employees**. MSI lied about being a small business, defined as being under 500 employees. However, by choosing to falsely report the number "499" Defendants reveal their deceptive scheme. MSI grossly *underreported* its job numbers to avoid being disqualified because it had many more than 500 employees. MSI's own website claims it has 2000 employees, *more than quadruple* the amount falsely reported by them. The difference is large. On its loan application it certified that it employed "no more than the greater of 500

employees or, if applicable, the size standard in number of employees established by the SBA in 13 C.F.R. 121.201 for the Applicant's industry." MSI deceptively claimed to have **exactly 499 employees** (i.e. just <u>one</u> employee short of the maximum number of 500 employees allowed for eligibility). By choosing to report the exact figure 499 rather than 500 shows that they are trying to get under the 500 number, and yet not have the appearance of trying to maximize the numbers, such as a reported number like 500 might suggest. 499 reveals the extent of pre-meditation the Defendants undertook in their scheme. It is not an accident. It is not a close mistake. It is not a true headcount of any group of employees. There is no reason Defendants would report a figure of 499, other than to deceive the government.

10.    **Defendant Is Not a Small Business - Dominant In Its Field**

Some small business concerns can still be eligible for a PPP loan even if they have more than 500 employees, as long as they satisfy the existing statutory and regulatory definition of a "small business concern" under section 3 of the Small Business Act, 15 U.S.C. 632. 15 U.S. Code § 632 (a) (1) generally defines small business concerns as businesses which are "not dominant in its field of operation." Defendant is a highly successful and large business. As one of the most prolific property underwriting companies in the country, it <u>is</u> dominant in its field of operation. These loans are not meant for dominant companies because companies dominant in their field, are typically larger, have a history of revenue, have stored assets, have partners, relationships and access to lenders. These types of companies have the resources to draw upon to support their businesses if some economic uncertainty arises. Dominant companies are not fragile. They often need no external support. PPP loans were intended for fragile companies, in financial trouble, not companies who did not need any assistance.

11.    __The Significance of the Number 499 – Reveals Deceptive Scheme__

There is no count of the Defendant's employee numbers which could result a

499 figure. The reporting of 499 cannot be explained away. The fact that the Defendant falsely

provided 499 on its application reveals that they thought through the deception. They wanted to

make sure to provide a figure which was under the 500 maximum, but not appear to be asking for

the maximum, 500. The same deceptive intent and certification was made regarding the dire

economic troubles and substantial loss of revenues, which Defendant did not experience. The same

deceptive intent and certification was also made when Defendant claimed a loan was necessary to

support its continuing operation, and that loan was necessary from the US government, as opposed

to their business associates or their own coffers.

12.    __Alternative Size Standards Not Met Either__. The SBA's size standard for

businesses in their industry of All Other Professional, Scientific and Technical Services (NAICS

Code 541990) was $16.5M[2] as of the date MSI's loan was approved.[3] Relator is informed and

believes that MSI'S annual receipts were well in excess of $16.5M. Among other things, it is clear

from MSI'S stated payroll of $6,703,446 for 2.5 months of salaries that the annual receipts of MSI

were far in excess of the $16.5M maximum. Specifically, MSI certified that 100% of the

$6,703,446 loan was to be used for payroll, which under the PPP and CARES Act rules equates to

two and one-half (2 ½) months of salaries, which annualized is equal to annual salaries totaling

$32,176,540. Therefore, unless MSI operated at $22,176,540 loss when it applied for the loan, it

had annual receipts in excess of the $16.5M size standard applicable for NAICS Code 541990.

---

[2] https://www.ecfr.gov/current/title-13/chapter-I/part-121

[3] The size standards themselves are expressed either in number of employees or annual receipts in millions of dollars, unless otherwise specified. The number of employees or annual receipts indicates the maximum allowed for a concern and its affiliates to be considered small.

Furthermore, independent reports conform that MSI had annual revenues of between $260 million and $1.3 billion. Therefore, MSI was not and *could not* <u>have been</u> a small business and was not eligible to apply for and receive the PPP Loan.

13.    **<u>No Economic Necessity</u>**. The PPP was made to help struggling businesses which were unsure about being *able* to pay their workers. The second certification in the application was: "Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." The word "necessary" is important. The SBA required that the COVID pandemic caused enough economic uncertainty so that company payroll was jeopardized. That is a distinct standard. It is not enough that there was *some* economic uncertainty. The uncertainty must be to the level <u>adverse enough to threaten payroll</u>. There must be sufficient economic uncertainty, such that the company's engine room and most important asset, its people, were threatened with unaffordability for the business. In other words, the business must be on life support. The business must have been in financial trouble to the point where its most important resource, its people, were in danger of being lost. That level of economic uncertainty was not present with MSI. The PPP was not a free excuse to raid government coffers by wealthy businessmen. MSI did not need the loans -- there was no "need" or "economic necessity" to pay Defendant's payroll expenses.[4] MSI did not and cannot show any decline in revenue during the pandemic, much less a decline so bad it threatened worker pay. There are no reports of dire financial news or business decline which one would normally see from a business which could need help with payroll. There were:

---

[4] MSI is not a small business in dire financial straits, but rather a well-financed and successful construction company. Public information shows their revenue was not declining, and their own statements indicate continued growth and profits. Defendant cannot show "economic necessity" in needing the loans to continue business operations.

- No office closures;

- No large layoffs;

- No apologies to customers;

- No sale of company assets;

- No announcement of cost cutting measures;

- No debt restructuring;

- No employee strikes/organized complaints;

- No scaling back of services;

- No location reductions; or

- No loans taken from any other sources, apart from the PPP.

Yet Defendants falsely certified they had "economic uncertainty" so bad that it threatened payroll, so they could take financial assistance from the US taxpayer.

14.     **Loan Not Necessary From the US Government**. On their application to the government Defendants made the Certification that: "Current economic uncertainty makes *this* loan request necessary to support the ongoing operations of the Applicant." The word "*this*" in the Certification is critical because it refers to the PPP loan. It means the loan was necessary <u>from the US government</u>, as opposed to loans or financial assistance from alternate sources like a private bank, business partners or others. If the Defendants could have easily got financial assistance from other sources, *this* loan would not be necessary.

In truth, if Defendants needed help, a loan or other financial assistance <u>could</u> have come from other sources. Since assistance money could easily have come from other sources, Defendants were lying when they Certified that assistance *needed* <u>to come from the US</u>

government. Defendants could have obtained assistance from other sources. This particular loan was not necessary, so this Certification was false.

15.     **Money Not Returned**. The loan was taken by a business which was not allowed to take even one penny in loans, let alone millions of dollars. However, at some point the Defendants could have changed course. They could have returned the money. They did not. They doubled down on their misappropriation by seeking loan forgiveness. The approximately $6.7M in funds should have been returned immediately. This loan should never have been sought in the first place. Yet the Defendants went further by obtaining total loan forgiveness, billing the US taxpayers millions of dollars. *Defendants have not returned the loan proceeds to this day*.

16.     **Further Falsification on Loan Forgiveness**. Defendants falsified further documents to receive loan forgiveness. Defendants had to attest as to the use of the funds and the amount used on authorized purposes. They were not because Defendants could not comply with the requirements of forgiveness given their business type. So, Defendants also lied on their forgiveness documents and application.

17.     **Defendant's False Statements and Fraud**. Defendants knowingly and intentionally made many materially false statements to the government and bank to obtain the loans.

18.     Plaintiff brings this action as relator on behalf of the United States to recover treble damages, civil penalties, and costs under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33 Plaintiff gave notice of its intent to file and full disclosure of the evidentiary basis to the Department of Justice ("DOJ").

## THE PARTIES

19.    Plaintiff is a California limited liability company with its principal place of business in Los Angeles County, California.

20.    Defendant Andy Noe is an individual and, at all relevant times herein, is and was a Vice President of MSI.

21.    Defendant John Noe is an individual and, at all relevant times herein, is and was the Chief Executive Officer of MSI.

22.    Defendant Tom Noe is an individual and, at all relevant times herein, is and was a Vice President of MSI.

23.    Defendant Mueller Services, Inc., is a New York Corporation formed in 1980 with its principal place of business located at Tonawanda, New York.

24.    Defendant MSI is an insurance and risk assessment report generation company, specializing in high-value residential and commercial properties.

25.    The true names and capacities, whether individual, partner, associate, corporate or otherwise, of Defendant DOES 1 through 10, inclusive, and each of them, are unknown to Plaintiff, who therefore sues said Defendant(s) by such fictitious names.  Plaintiff is informed and believes and thereon alleges that each Defendant designated herein as a "DOE" is legally responsible in some manner for the events and happenings herein mentioned.  Plaintiff will seek leave of Court to amend this Complaint to reflect the true names and capacities of said DOES, and add appropriate charging allegations against said DOES when their identities have been ascertained.  Plaintiff is informed and believes that each of the DOE Defendants were responsible in some manner for the injuries and damages alleged herein, and/or for the wrongful acts of some or all of the Defendants.

26.     Plaintiff is further informed and believes that each of the Defendants, whether specifically named or named as a DOE, was an agent, employee, servant and/or representative of each of the remaining Defendants, and, in doing or failing to do the things alleged herein, was acting within the course and scope of said agency, employment, service and/or representation.

27.     Plaintiff is further informed and believes that each of the Defendants, whether specifically named herein or named as a DOE, approved, ratified and/or acquiesced in the acts and omissions of each of the remaining Defendants.

28.     Plaintiff is further informed and believes that each of the Defendants herein, whether named as DOES or otherwise, acted in concert, agreement and conspiracy with the other defendants for the common purpose of engaging in a scheme to defraud as alleged below.

## THE CARES ACT AND PAYCHECK PROTECTION PROGRAM

29.     On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act ("the CARES Act" or "the Act") (Pub. L. 116-136) became law and provided emergency assistance and health care response for eligible individuals, families, and businesses affected by the coronavirus pandemic. SBA received funding and authority through the Act to modify existing loan programs and establish a new loan program to assist small businesses nationwide adversely impacted by the COVID-19 emergency.

30.     The CARES Act authorized loans to eligible small businesses struggling to pay employees and stay in business as a result of the devastating effect of the COVID-19 pandemic and resulting restrictions.

31.     Section 1102 of the CARES Act temporarily permitted the SBA to guarantee 100 percent of 7(a) loans under a new program titled the "Paycheck Protection Program" ("PPP").

32.     On April 24, 2020, the Paycheck Protection Program and Health Care Enhancement Act (Pub. L. 116-139) was enacted to provide additional funding and authority for the PPP. On June 5, 2020, the PPP Flexibility Act of 2020 (Flexibility Act) (Pub. L. 116-142) was enacted, changing key provisions of the PPP, including provisions relating to the maturity of PPP loans, the deferral of PPP loan payments, and the forgiveness of PPP loans.

33.     Under the PPP, in 2020, eligible businesses could obtain one SBA guaranteed PPP loan. Businesses were required to spend all loan proceeds only for employee compensation, rent or mortgage, and certain other specified expenses. Depending on their use of the loan proceeds as certified, they could qualify for loan forgiveness, up to the full amount of the loan.

34.     The SBA delegated authority to third-party lenders to underwrite and approve the PPP loans. In order to obtain a PPP loan, whether a "First Draw" or "Second Draw" loan, an eligible business (through its authorized representative) had to sign and submit a PPP loan application (SBA Form 2483) online through the lender's platform. The PPP loan application (SBA Form 2483) required the business (through its representative) to acknowledge the PPP program rules and make certain certifications in order to be eligible to obtain the PPP loan, including certifying that their certifications were true.

35.     Once the Borrower submitted its PPP loan application (SBA Form 2483) to a Lender, the participating lender processed the PPP loan application. If a PPP loan application (SBA Form 2483) was approved by the lender, it funded the PPP loan with its own funds, which were 100% guaranteed by the SBA.

36.     After the Lender processed and approved a borrower's PPP loan application (Form 2483), but prior to the closing of the PPP loan, the Lender submitted to the SBA, the Lender's Application - Paycheck Protection Program Loan Guaranty (SBA Form 2484) to the SBA applying

for a guarantee on the loan. For a PPP loan to be approved, the Lender was required to Answer

Yes to the following questions in the Lender's Application - Paycheck Protection Program

Loan Guaranty (SBA Form 2484) as to the Borrower's certification of its General Eligibility to

receive a PPP Loan:

| | | | |
|---|---|---|---|
| • | The Applicant has certified to the Lender that (1) it was in operation on February 15, 2020, has not permanently closed, and was either an eligible self-employed individual, independent contractor, or sole proprietorship with no employees or had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099MISC; (2) current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant; (3) the funds will be used to retain workers and maintain payroll, or make payments for mortgage interest, rent, utilities, covered operations expenditures, covered property damage costs, covered supplier costs, and covered worker protection expenditures; and (4) the Applicant has not and will not receive another loan under the Paycheck Protection Program, section 7(a)(36) of the Small Business Act (15 U.S.C. 636(a)(36)) (this does not include Paycheck Protection Program second draw loans, section 7(a)(37) of the Small Business Act (15 U.S.C. 636(a)(37)). | ☐ Yes | ☐ No |

SBA Form 2484 (emphasis added). Therefore, if a PPP borrower lied on its PPP loan

application (SBA Form 2483), the PPP borrower's false certification caused the Lender to submit

to the SBA with respect to that PPP Loan, a Lender's Application - Paycheck Protection Program

Loan Guaranty (SBA Form 2484) that contained the PPP borrower's False Statement.

37.    SBA Form 2483 includes the following certification, among others: "I have read

the statements included in this form, including the Statements Required by Law and Executive

Orders, and I understand them" (the "Understanding Certification").

38.    SBA Form 2483 also includes the following certification, among others: "The

Applicant is eligible to receive a loan under the rules in effect at the time this application is

submitted that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (the Paycheck Protection Program Rule)" (the "Eligibility Certification").

39.    SBA Form 2483 also includes the following certification, among others "All SBA loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rule" (the "Use of Proceeds Certification").

40.    SBA Form 2483 also includes the following certification, among others: "Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant" (the "Economic Necessity Certification").

41.    SBA Form 2483 also includes the following certification, among others: "The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud" (the "Worker Retention and Payroll Certification").

42.    SBA Form 2483 also includes the following certification, among others: "During the period beginning on February 15, 2020 and ending on December 31, 2020, the Applicant has not and will not receive another loan under the Paycheck Protection Program." (the "Single Loan Certification").

43.    SBA Form 2483 also includes the following certification, among others: "I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that

knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000" (the "No False Statements Certification").

44.     After the borrower submitted a PPP loan application, it was processed by the participating lender. If the PPP loan application was approved, the participating lender funded the loan using its own monies, which were then guaranteed by the SBA. Generally, in the event the borrower defaulted on a PPP loan, the SBA would purchase the borrower's debt from the lender and be responsible for its repayment.

45.     Under applicable SBA rules and guidance, recipients of PPP loans could apply to have principal and interest on the PPP loan fully forgiven, meaning that the borrower would owe nothing and would have no obligation to repay the PPP loan. To obtain full forgiveness of the PPP loan, borrowers had to attest that they had "not reduced the number of employees or the average paid hours of [their] employees" during the loan period, that the loan proceeds had been spent on payroll costs and other permitted expenses and that at least 60% of the loan proceeds had been spent on payroll costs (hereafter the "Loan Forgiveness Certification").

46.     Loans could only be used for certain permitted expenses, such as to pay employees' salaries, employee benefits, mortgage interest, rent, utilities or worker protection costs related to COVID19.

47.     More specifically, the loan forgiveness application (SBA Form 3508), revised as of July 30, 2021, included the following certifications, among others:

(1)    The dollar amount for which forgiveness is requested:

- was used to pay costs that are eligible for forgiveness (payroll costs to retain employees; business mortgage interest payments; business rent or lease payments; or business utility payments);

- includes all applicable reductions due to decreases in the number of full-time equivalent employees and salary/hourly wage reductions;

- includes payroll costs equal to at least 60% of the forgiveness amount;

- if a 24-week Covered Period applies, does not exceed 2.5 months' worth of 2019 compensation for any owner-employee or self-employed individual/general partner, capped at $20,833 per individual; and

- if the Borrower has elected an 8-week Covered Period, does not exceed 8 weeks' worth of 2019 compensation for any owner-employee or self-employed individual/general partner, capped at $15,385 per individual.

(2)    I understand that if the funds were knowingly used for unauthorized purposes, the federal government may pursue recovery of loan amounts and/or civil or criminal fraud charges.

(3)    The Borrower has accurately verified the payments for the eligible payroll and nonpayroll costs for which the Borrower is requesting forgiveness.

(4)    The Borrower's eligibility for loan forgiveness will be evaluated in accordance with the PPP regulations and guidance issued by SBA through the date of this application.

48.    On April 23, 2020 in FAQs No. 31, the SBA reiterated that the economic necessity certification must be made in good faith and that publicly traded companies are not likely to be

able to make that certification in good faith, stating "it is unlikely that a public company with substantial market value and access to capital markets will be able to make the required certification in good faith…"

## DEFENDANTS' FRAUD

49.     During round 1 of the PPP, Defendant MSI applied for a PPP loan for $6,703,446. It was approved on April 15, 2020, by the SBA for the full amount, which was disbursed. The loan was facilitated by Northwest Bank. Defendant received 100% of the approved amount. On its application for this loan, Defendant stated that it had 499 employees for which it needed the loan, suspiciously just 1 short of the maximum number before becoming ineligible altogether. This loan was forgiven on June 11, 2021.

50.      Defendants were not a "small-business concern" and did not satisfy any of the alternate tests to make it eligible to receive a PPP loan. Both executives, Steve Findlay and James Smith are sophisticated, experienced businessmen. They must have known or should have known about the restrictions. Even if they did not know of all the restrictions, if they understood some of the rules, they would have quickly realized these loans are not permissible. The legal and financial experts he has hired over the years would have known this. The Defendants intentionally broke these clear rules knowing what they were doing. They should have had the information necessary for them to realize the PPP was restricted and their companies were ineligible.

51.     Defendants would have had to manage and investigate the many regulations in administering their companies. They would have quickly discovered that the PPP assistance to them was not permitted, especially given the amounts involved.

52.     The information and especially the numbers provided by Defendants strongly evidence a scheme to defraud. This includes the number of employees reported and the amount of

loans requested. The Defendants knew when they claimed that MSI had 499 employees that such a statement was false. MSI did <u>not have 499 employees</u>, they had substantially more than 500 employees and if the true and correct number of their employees was reported by Defendants, MSI would not be eligible to obtain a PPP loan, because it would not be considered a small business, had more than 500 employees, and could not qualify as a small business under the size standard principal.

53.     In addition to applying any applicable business type ineligibility rules, all borrowers should carefully review the required Economic Certainty certification on the Borrower Application Form stating that ''[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant.''

54.     MSI and its owner abused the PPP program. From misrepresenting a serious economic need for the loan, to willfully ignoring ineligibility based on size and revenue, to maximizing the amount of the loan and then obtaining loan forgiveness, the Defendants orchestrated an intentional scheme to simply skim money from the program.

55.     Discovery will reveal what exactly the $6,703,446 million in US taxpayer dollars was spent on, but what is obvious is that Defendants *<u>did not need</u>* any of that money from the US government. MSI is and was highly profitable during the pandemic. Defendants did not suffer any business loss and certainly had the money to pay their own worker's wages given their extensive history of profit and list of assets.

56.     Defendants signed the loan applications, thereby endorsing the Understanding Certification, which means that they agreed that they understood the rules and guidelines of the PPP, including, without limitation the rules regarding use of proceeds and the certifications made.

57.     The proceeds of the PPP Loans were not and could not have been used only for authorized purposes consistent with the PPP Rules, because, among other things, the Defendants were obviously not allowed to apply for PPP loans because of their ready access to money, and their company size (which exceeds 500 employees). Therefore, when Defendants made the Use of Proceeds Certification, the certification was false.

58.     The proceeds of the PPP loans were not necessary to support the ongoing operations of MSI. The company was nowhere near a financial precipice. Far from it. The company enjoyed record high business achievements since 2020 until today. This company had considerable financial resources to pay its own workers, assuming that is where the money was spent rather than into the pocket of the CEO and its executives. Therefore, when Defendants made the Economic Necessity Certification, the certification was false.

59.     The PPP loan money was only allowed to be used on *authorized* expenses. The proceeds of the PPP Loan were not permitted to be used to pay for the very much affordable business costs for this large publicly traded business with access to billions of dollars in public funding, therefore when Defendant made the Worker Retention and Payroll Certification, the certification was false.

60.     By virtue of the above false statements, when Defendants made the No False Statements Certification, that certification was false.

61.     The Defendants actively pursued and obtained loan forgiveness. Because MSI is prohibited from obtaining any PPP loans, its representation on its forgiveness application that it spent 100% of the loan proceeds on eligible expenses was not truthful. The SBA would not have forgiven the loans if they knew Defendants' certifications described above were false.  They also

18

would not have forgiven the loans if they knew the proceeds had been used to increase profits instead of paying their employees.

62.     As a result of the forgiveness, Defendants have not repaid the loan and have kept the proceeds, and the loan has been repaid with money from taxpayers, including the small businesses and owners who were supposed to receive the PPP funds instead of repaying a profitable corporation's loan that it never should have received, let alone had forgiven.

## THE FALSE CLAIMS ACT

63.     The False Claims Act prohibits fraudulent conduct in connection with federal programs, including the knowing submission of false claims for payment to the government. See 31 U.S.C. § 3729(a)(1)(A). In these circumstances, liability may attach if the omission renders those representations misleading. 41. 31 U.S.C. § 3729(a)(1)(A) and (B) of the FCA provide that:

(1) . . . any person who—

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim,

. . .

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government . . .

31 U.S.C. § 3729(a)(1)(A), (B), and (G) (2020).

42. The scope of a false or fraudulent claim is to be broadly construed. As used in the FCA, a "claim"

(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; . . .

31 U.S.C. § 3729(b)(2) (2020).

64. A person who violates the False Claims Act during the time period at issue "is liable for a civil penalty as adjusted, plus 3 times the amount of damages which the United States Government sustains because of the act of that person." 31 U.S.C. § 3729(a). See 28 C.F.R. § 85.3(a)(9); Department of Justice, 28 CFR Part 85, Civil Monetary Penalties Inflation Adjustments for 2022 published at: https://www.govinfo.gov/content/pkg/FR-2022-05-09/COMMERCE/2022-09928.COMMERCE.

## FIRST CAUSE OF ACTION

## FALSE OR FRAUDULENT CLAIMS (31 U.S.C. § 3729(a)(1)(A-B))

65.     Plaintiff alleges and incorporates by reference each and every allegation contained in all prior paragraphs of this complaint.

66.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

67.     By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, to an officer or employee of the United States government, false or fraudulent claims for payment or approval, in violation of the FCA, 31 U.S.C. § 3729(a)(l)(A). Specifically, each of Defendants' Economic Necessity, No False Statements, Eligibility, Use of Proceeds, Understanding, Worker Retention and Payroll Certifications described above all were knowingly false, and relied upon by lenders and the SBA in approving the PPP Loans.  Their request for forgiveness contained a further misrepresentation that the loans had been used only for authorized purposes.

68.     By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims for payment by the Government.

69.     The Government and its agents and contractors relied on those false statements in approving and making the loans and subsequently forgiving them, leaving the burden of repayment on taxpayers.

70.     Because of the Defendants' acts, the United States sustained damages in an amount to be determined at trial and, therefore, is entitled to treble damages under the FCA, plus civil penalties of not less than $12,537.00 and not more than $25,076.00 for each and every violation

arising from Defendants' unlawful conduct alleged herein, and attorneys' fees in an amount to be proven.

## CONCLUSION

71.    The Noe brother executives used the PPP as an excuse to raid the US taxpayer's coffers. They took $ 6,703,446 from the PPP, not a penny of which was necessary. The PPP was meant for businesses struggling to afford payroll. Now that program is dry, and many are out of work. The American people have a right to reconciliation.

## **PRAYER FOR RELIEF**

WHEREFORE, qui tam Plaintiff/Relator prays for judgment against Defendants, as follows:

1. That this Court enter judgment against each Defendant in an amount equal to three times the damages that the United States has sustained because of Defendants' action, plus a civil penalty of not less than $12,537.00 and not more than $25,076.00 for each and every false claim as are required by law, together with all such further relief as may be just and proper.

2. Such other relief as this Court may deem just and proper, together with interest and costs of this action.

3. Reasonable attorney fees, litigation expenses, and costs of suit.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: February 7, 2024

Respectfully submitted,

David L. Hecht
HECHT PARTNERS LLP
125 Park Avenue, 25th Floor
New York, NY 10017
(212) 851-6821
dhecht@hechtpartners.com

Attorneys for Plaintiff-Relator
RELATOR LLC